Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL II

| | | |
|---|---|---|
| SERGIA LICELOT DE LOS SANTOS ROJAS Y OTROS<br><br>Recurridos<br><br>v.<br><br>SISTEMA UNIVERSITARIO ANA G. MÉNDEZ, INCORPORADO Y OTROS<br><br>Peticionarios | KLCE202400361 | *CERTIORARI* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso número: BY2019CV06011<br><br>Sobre: Daños, Incumplimiento de Contrato |

Panel integrado por su presidente, el juez Bermúdez Torres, el juez Adames Soto y la juez Aldebol Mora.

Aldebol Mora, Juez Ponente

# RESOLUCIÓN

En San Juan, Puerto Rico, a 7 de mayo de 2024.

Comparece la parte peticionaria, Sistema Universitario Ana G. Méndez, mediante el recurso de epígrafe y nos solicita que revoquemos la *Resolución* emitida por el Tribunal de Primera Instancia, Sala Superior de Bayamón, el 28 de septiembre de 2023, notificada el día siguiente. Mediante el referido dictamen, el foro primario declaró No Ha Lugar la *Solicitud de Sentencia Sumaria Parcial*, promovida por la parte recurrida, Sergia Licelot de los Santos Rojas, Mayra Rivera del Valle, Luis Daniel Gómez Fonseca y Pedro Hernández Rodríguez. A su vez, declaró No Ha Lugar la *Moción en Solicitud de Sentencia Sumaria* presentada por la parte peticionaria.

Por los fundamentos que expondremos a continuación, se deniega la expedición del auto solicitado.

## I

El 9 de octubre de 2019, Sergia Licelot de los Santos Rojas, Mayra Rivera del Valle, Luis Daniel Gómez Fonseca, Pedro Hernández Rodríguez

Número Identificador

RES2024 _____

(recurridos) y Eileen Cruz Lebrón[1] incoaron una *Demanda*,[2] posteriormente enmendada en varias ocasiones,[3] sobre daños y perjuicios en contra del Sistema Universitario Ana G. Méndez (Universidad AGM o peticionaria). Indicaron que, entre el año 2015 al 2017, se matricularon respectivamente en la *Maestría de Ciencias en Enfermería*, ofrecida por la Universidad AGM, recinto de Bayamón. Señalaron que, con el fin de costear los gastos relacionados a dicho programa graduado, cada uno tomó préstamos estudiantiles. Alegaron que, en junio de 2018, la Universidad AGM les informó que debían matricularse en un curso adicional, llamado *Diagnóstico Diferencia*, como requisito para obtener el grado de maestría y para poder tomar la certificación y/o reválida de la Junta Nacional de los Estados Unidos, ofrecida por la American Association of Critical Care Nurse (AACCN). Según adujeron, el mencionado curso no estaba incluido en el catálogo de la Universidad AGM como parte del programa en cuestión, lo cual resultó en gastos adicionales y la dilación de la aprobación del programa, así como la posterior certificación y/o revalidación.

Los recurridos plantearon en su causa de acción que, culminado el mencionado curso y tras cumplir con los requisitos descritos en el currículo pertinente, la Universidad AGM le informó a Sergia Licelot de los Santos Rojas y a Luis Daniel Gómez Fonseca que no podían tomar la certificación y/o reválida para ejercer la profesión. Argumentaron que ello obedecía a que dicho programa no estaba acreditado desde el año 2015, conforme a las exigencias de las entidades pertinentes, lo cual redundaba a que los recurridos estarían impedidos de solicitar la certificación y/o reválida para poder ejercer la profesión, pese a los años de estudios cursados, el tiempo y dinero invertido, así como las deudas contraídas por medio de préstamos estudiantiles. Sostuvieron que, debido a lo anterior, sus expectativas de obtener mayores ingresos y trabajar en los Estados Unidos fue reprimida.

---

[1] Cabe señalar que, el 14 de marzo de 2022, Eileen Cruz Lebrón presentó una moción mediante la cual desistió sin perjuicio de la acción de epígrafe por motivos de salud. En atención a ello, el 28 de marzo de 2022, el Tribunal de Primera Instancia emitió y notificó una *Sentencia Parcial* a esos efectos. Véase, Apéndice Ñ y O del recurso, págs. 128-130.
[2] Apéndice C del recurso, págs. 15-19.
[3] Apéndice D, F y P del recurso, págs. 20-24, 29-33, 131-135.

Alegaron, además, que ello les generó frustración, malestar e inestabilidad emocional.

En la *Demanda*, los recurridos arguyeron que la Universidad AGM fue negligente al ofrecer un programa graduado conociendo o debiendo conocer que este no se encontraba acreditado conforme a las exigencias de las entidades pertinentes, incurriendo, a su vez, en incumplimiento contractual. Enfatizaron que el mencionado programa no se encontraba acreditado desde el año 2015, a pesar de que la Universidad AGM ofreció y cobró los cursos conducentes al programa, produciéndoles daños. En virtud de ello, solicitaron el pago de varias cuantías por los daños ocasionados, así como la imposición de costas y honorarios de abogado(a).

Por su parte, el 27 de enero de 2023, la Universidad AGM presentó su alegación responsiva.[4] En esencia, negó las alegaciones en su contra. Alegó que, al momento de los hechos, poseía las acreditaciones de las agencias reguladoras para su operación y para proveer los servicios educativos que brindaba. Afirmó que actuó dentro de las mejores prácticas de la industria, por lo que negaba cualquier imputación de negligencia o culpa.

Luego de varias incidencias procesales, el 13 de junio de 2023, los recurridos instaron una *Solicitud de Sentencia Sumaria*.[5] En esencia, alegaron que la Universidad AGM incumplió al ofrecer una maestría que se encontraba obsoleta, por lo que, luego de incurrir en préstamos estudiantiles y tras aprobar la maestría con calificaciones sobresalientes,

---

[4] Apéndice Q del recurso, págs. 136-141. Véase, además, Apéndice E y G del recurso, págs. 25-28, 34-38.

[5] Apéndice R del recurso, págs. 142-169. Los recurridos incluyeron junto a su moción los siguientes documentos: (1) copia del *Requerimiento de Admisiones*, con fecha del 1 de julio de 2020; (2) copia de la *Contestación a Requerimiento de Admisiones*, con fecha de septiembre de 2020; (3) copia de mensaje por correo electrónico de Mayra G. Pedroza López dirigido a Pedro Hernández Rodríguez, con fecha del 20 de junio de 2019; (4) copia de la deposición de Mayra G. Pedroza López, con fecha del 8 de febrero de 2022; (5) copia de la transcripción de créditos de Mayra Rivera del Valle, con fecha del 22 de octubre de 2021; (6) copia de la transcripción de créditos de Luis Daniel Gómez Fonseca, con fecha del 17 de julio de 2019; (7) copia de la transcripción de créditos de Sergia Licelot de los Santos Rojas, con fecha del 30 de abril de 2021; (8) copia de la transcripción de créditos de Pedro Hernández Rodríguez, con fecha del 30 de abril de 2021; (9) copia del *Primer Pliego de Interrogatorios y Producción de Documentos*, con fecha del 1 de julio de 2020; (10) copia de la *Contestación a Carta en Objeción a la Contestación del Pliego de Interrogatorio*, con fecha del 18 de mayo de 2021. Véase, Apéndice R del recurso, págs. 170-363.

se vieron imposibilitados de certificarse en el referido programa graduado. Por ello, reclamaron a dicha entidad los ingresos futuros dejados de percibir, las deudas de los préstamos estudiantiles, angustias y sufrimientos, entre otras partidas. Sostuvieron que, culminado el descubrimiento de prueba, obtuvieron admisiones de la Universidad AGM que aclaraban las controversias del caso, dando paso a una resolución sumaria de este.

Los recurridos especificaron que la entidad universitaria había admitido lo siguiente: (1) que la agencia acreditadora Accreditation Commission for Education in Nursing (ACEN), obligaba a la Universidad a desarrollar y supervisar con regularidad el currículo de maestría como especialista clínico, para asegurar su integridad, rigor y actualización; (2) que, en el año 2015, las organizaciones que certifican la maestría en los Estados Unidos realizaron cambios en el currículo de la maestría que nos ocupa; (3) que el examen para certificar la maestría en controversia fue eliminado; (4) que la maestría eliminada fue convertida en una certificación con especialidad en "Adulto-Gero"; (5) que se encontraba en el proceso de crear la certificación de la nueva especialidad en "Adulto-Gero"; (6) reiteró que, en el año 2015, la maestría ofrecida a los recurridos se "eliminó"; (7) que se encontraba en el proceso de crear una nueva certificación de la nueva especialidad creada por las agencias acreditadoras.

En su petitorio sumario, los recurridos argumentaron que la Universidad AGM incumplió con su deber de desarrollar y supervisar la maestría ofrecida a estos, así como tampoco aseguró la integridad, rigor y actualización de la misma. Indicaron que, consecuentemente, no pudieron certificarse en tal maestría. Ante ese escenario, plantearon que no existía controversia sustancial de hechos esenciales y pertinentes que ameritara la celebración de una vista en su fondo, en cuanto a la negligencia exhibida por la Universidad AGM. En virtud de ello, solicitaron que se dictara sentencia sumaria parcial a su favor, decretando que la Universidad AGM incumplió su deber contractual para con estos y, a su vez, incumplió con

las exigencias requeridas por la ACEN al ofrecerles y cobrarles por una maestría que se encontraba obsoleta y/o descontinuada, razón por la cual no pudieron certificarse. Por otro lado, alegaron que la Universidad AGM obró con temeridad al no aceptar su negligencia y responsabilidad, a pesar de sus admisiones y tomando en cuenta los hechos incontrovertidos. En desacuerdo, posteriormente, la Universidad AGM se opuso a la solicitud de sentencia sumaria parcial promovida por los recurridos.[6]

Al día siguiente, la Universidad AGM presentó una *Moción en Solicitud de Sentencia Sumaria*.[7] En síntesis, alegó que el Programa de Enfermería ofrecido a los recurridos cumplía cabalmente con los requisitos y acreditaciones en Puerto Rico. Indicó que el contrato entre las partes fue el currículo de clases y que en ninguna parte del Manual de Estudiante de la institución universitaria se hacía representación de que, una vez graduado el estudiante de Maestría, podrá ser candidato a tomar las certificaciones o reválida que ofrecen las organizaciones en los Estados Unidos. Arguyó que los recurridos no habían presentado evidencia que demostrara que esta haya representado que los estudiantes podían tomar la certificación en los Estados Unidos, pues lo único que había indicado la institución era que, una vez graduados, estos podían comparecer ante la

---

[6] Apéndice U del recurso, págs. 591-615. Con el escrito, la Universidad AGM presentó los siguientes documentos: (1) copia de la acreditación del Consejo de Educación de Puerto Rico, con fecha del 7 de diciembre de 2018; (2) copia de la acreditación del Accreditation Commission of Education in Nursing, con fecha del 6 de abril de 2015; (3) copia de la página web Registered Nursing sobre el *Clinical Nurse Specialist Certification*, con fecha del 9 de febrero de 2023. Véase, Apéndice U del recurso, págs. 616-638.

[7] Apéndice S del recurso, págs. 364-387. Junto a su moción, la Universidad AGM incluyó los siguientes documentos: (1) copia de la transcripción de créditos de Pedro Hernández Rodríguez, con fecha del 30 de abril de 2021; (2) copia de la transcripción de créditos de Sergia Licelot de los Santos Rojas, con fecha del 30 abril de 2021; (3) copia de la transcripción de créditos de Luis Daniel Gómez Fonseca, con fecha del 30 de abril de 2021; (4) copia de la trascripción de créditos de Mayra Rivera del Valle, con fecha del 22 de octubre de 2021; (5) copia de la transcripción de créditos de Wilberto García Jiménez, con fecha del 27 de marzo de 2023; (6) copia de la transcripción de créditos de Sara Z. Cadena Cruz, con fecha del 27 de marzo de 2023; (7) copia de la trascripción de créditos de Liznel N. Erazo Torres, con fecha del 27 de marzo de 2023; (8) copia del *Manual de Estudiante* del Programa Graduado en Ciencias de Enfermería, con fecha de enero de 2018; (9) copia parcial de la deposición de Mayra G. Pedroza López, con fecha del 8 de febrero de 2022; (10) copia parcial de la deposición de Liznel N. Erazo Torres, con fecha del 9 de febrero de 2022; (11) copia parcial de la deposición Luis Daniel Gómez Fonseca, con fecha del 7 de febrero de 2022; (12) copia parcial de la deposición de Sara Z. Cadena Cruz, con fecha del 10 de febrero de 2022; (13) copia parcial de la deposición de Mayra Rivera del Valle, con fecha del 23 de febrero de 2022; (14) copia parcial de la deposición de Wilberto García Jiménez, con fecha del 1 de febrero de 2022; (15) copia parcial de la deposición de Sergia Licelot de los Santos Rojas, con fecha del 7 de febrero de 2022; (16) copia parcial de Pedro Hernández Rodríguez, con fecha del 8 de febrero de 2022. Véase, Apéndice S del recurso, págs. 388-474.

Junta Examinadora de Enfermería en Puerto Rico. Asimismo, adujo que los recurridos no poseían evidencia alguna que corroborara que el curso de Diagnóstico Diferencial fue incluido para que ellos tomaran la certificación, porque tal aseveración no era cierta.

La Universidad AGM sostuvo que los recurridos no habían exigido su derecho a que la Junta Examinadora de Enfermeros en Puerto Rico les otorgue la reválida, pues era dicha entidad la que les tenía que ofrecer la reválida en la práctica avanzada. Sobre ese particular, especificó que, si los recurridos deseaban reclamar que no habían podido tomar la licencia para ejercer la profesión en Puerto Rico, tal reclamo debía ser presentado contra la referida Junta, que es la entidad llamada por Ley a ofrecer el examen o licencia y quien no ha ofrecido las mismas, en un craso incumplimiento con nuestro ordenamiento jurídico. Afirmó que en nada de lo anterior tenía que ver la entidad universitaria, quien únicamente otorgaba el grado de Maestría. Abundó que no tenía responsabilidad alguna sobre los cambios que realizaban las organizaciones que ofrecían las certificaciones en controversia, a diferencia de la Junta Examinadora de Enfermeros de Puerto Rico quien sí tenía el deber de cumplir con las disposiciones establecidas en su ley habilitadora y reglamentación. Reiteró que no había representado que los recurridos podían obtener las certificaciones una vez graduados, pues únicamente se comprometió en brindar la Maestría, cuyo grado fue conferido a los recurridos una vez cumplieron con los requisitos de graduación.

En vista de lo anterior, la Universidad AGM sostuvo que la acción de epígrafe debía ser desestimada, toda vez que la entidad universitaria no tenía nada que ver con las decisiones y cambios que realizaban las agencias u organizaciones que ofrecían las certificaciones de especialidad en los Estados Unidos. Reiteró que era la Junta Examinadora de Enfermeros de Puerto Rico quien tenía la obligación de crear un examen a esos efectos conforme a su ley habilitadora. Planteó que la parte recurrida carecía de una causa de acción que justificara la concesión de un remedio

en el presente caso, toda vez que la institución universitaria no tenía responsabilidad alguna en torno a las certificaciones que los recurridos deseaban obtener y no representó en momento alguno que los estudiantes podrían tomar la certificación ofrecida en los Estados Unidos. Por ello, solicitó que se declarara Ha Lugar su petitorio sumario y No Ha Lugar la *Demanda* incoada por la parte recurrida. En respuesta, el 12 de julio de 2023, los recurridos se opusieron y reiteraron su petitorio sumario parcial.[8]

Evaluadas las posturas de las partes, el 28 de septiembre de 2023, el Tribunal de Primera Instancia emitió la *Resolución* que nos ocupa.[9] En la misma, desglosó las siguientes determinaciones de hechos:

1. Los [recurridos], Sergia Licelot [d]e [l]os Santos Rojas, Mayra Rivera del Valle, Luis Daniel Gómez Fonseca y Pedro Hernández Rodríguez, poseen un bachillerato en Enfermería, de una institución debidamente acreditada.
2. Cada uno de los [recurridos] se matriculó en el SUAGM para cursar una Maestría en Ciencias de la Enfermería, como Especialista Clínico en el Cuidado Crítico del Adulto.
3. En agosto de 2017, el co[recurrido], Luis Daniel Gómez Fonseca, comenzó a estudiar en el programa graduado de Maestría de Ciencias en Enfermería, como Especialista Clínico en el Cuidado Crítico del Adulto, ofrecido por el SUAGM, en su recinto localizado en Bayamón, Puerto Rico.
4. Conforme al Manual del Estudiante de la Universidad, una de las metas de la institución es proveer a sus estudiantes "conocimientos teóricos, competencias y las destrezas prácticas, así como las actitudes adecuadas que le capacitarán para asumir posiciones de liderazgo en el campo de la enfermería en y fuera de Puerto Rico".
5. Al momento en que cada uno de los [recurridos] fue admitido en el SUAGM, dicha institución les distribuyó un panfleto en el que se hacían constar los requisitos para ser admitidos a la Universidad y los cursos ofrecidos para la Maestría en Ciencias de Enfermería, como Especialista Clínico.
6. Los [recurridos], Sergia Licelot [d]e [l]os Santos Rojas, Mayra Rivera del Valle, Luis Daniel Gómez Fonseca y Pedro Hernández Rodríguez aprobaron todos los cursos exigidos por el SUAGM para obtener la maestría en Ciencias de Enfermería, como Especialista Clínico en el Cuidado Crítico del Adulto.
7. La co[recurrida], Mayra Rivera del Valle, tomó y aprobó el curso de Diagnóstico Diferencial en marzo de 2019.
8. El co[recurrido], Luis Daniel Gómez Fonseca, tomó y aprobó el curso de Diagnóstico Diferencial en marzo de 2019.
9. La co[recurrida], Sergia Licelot de los Santos Rojas, tomó y aprobó el curso de Diagnóstico Diferencial, en el segundo semestre del año académico 2019.
10. El co[recurrido], Pedro Hernández Rodríguez, tomó y aprobó el curso de Diagnóstico Diferencial, en el segundo semestre del año académico 2019.

---

[8] Apéndice T del recurso, págs. 475-510. Los recurridos anejaron a su moción los siguientes documentos: (1) copia del panfleto sobre el programa de *Maestría en Ciencias de Enfermería*; (2) copia de la deposición de Mayra Rivera del Valle, con fecha del 23 de febrero de 2022; (3) copia de la *Contestación a Pliego Interrogatorio*, con fecha del 4 de noviembre de 2020. Véase, Apéndice T del recurso, págs. 511-590.
[9] Apéndice B del recurso, págs. 2-14.

11. La co[recurrida], Mayra Rivera del Valle, obtuvo el grado de Maestría de Ciencias en Enfermería, como Especialista Clínico en el Cuidado Crítico del Adulto, ofrecido por la Universidad, con un índice académico de 3.87.

12. El co[recurrido], Luis Daniel Gómez Fonseca, obtuvo el grado de Maestría de Ciencias en Enfermería, como Especialista Clínico, en el Cuidado Crítico del Adulto, ofrecido por la Universidad, con un índice académico de 3.87.

13. La co[recurrida], Sergia Licelot de los Santos Rojas, obtuvo el grado de Maestría de Ciencias en Enfermería, como Especialista Clínico en el Cuidado Crítico del Adulto, ofrecido por la Universidad, con un índice académico de 3.72.

14. El co[recurrido], Pedro Hernández Rodríguez, obtuvo el grado de Maestría de Ciencias en Enfermería, como Especialista Clínico, en el Cuidado Crítico del Adulto, ofrecido por la Universidad, con un índice académico de 3.38.

15. El 16 de mayo de 2019[,] se celebró una reunión en la Universidad en la que estuvieron presentes varios de sus funcionarios, además de Sergia Licelot de los Santos Rojas y Mayra Rivera del Valle, entre otros estudiantes.

16. El 20 de junio de 2019, la Dra. Mayra Pedroza López confirmó al [recurrido], Pedro Hernández Rodríguez, que la agencia que certificaba a los Especialistas Clínicos (*Critical Nurse Specialists* (CNS)) en los Estados Unidos eliminó el examen para los enfermeros de práctica avanzada con especialidad en cuidado crítico para convertirlo en una "Certificación CNS con Especialidad en Adulto-Gero".

17. A través del correo electrónico del 20 de junio de 2019, la Dra. Mayra Pedroza López informó, además, que la Universidad había comenzado un proceso para crear una certificación post-grado MSN-CNS-Adulto[-]Gero e indicó el status del proceso como sigue:

    - Aprobación de la Certificación Post-Grado MSN-CNS en Adulto-Gero por los cuerpos rectores de UAGM (Junta Académica, Consejo Administrativo). Completado.

    - Enviar a la Junta de Instituciones Post Graduadas (JIP) (antes Consejo de Educación Superior) la propuesta para que la misma sea aprobada. En Proceso.

    - Luego de la aprobación de la JIP, enviar un "*Substantive Change Document*" a ACEN (nuestra agencia acreditadora).

    - Someter todos los documentos de acreditación a AACN.

    - Los estudiantes deben poseer licencia de RN en USA o tomar NCLEX ya que Puerto Rico no pertenece al *National Council of State Boards of Nursing* (NCSBN).

    - Programar los cursos[.]

18. Conforme a la *Accreditation Commission for Education in Nursing* (ACEN), el currículo de maestría como especialista clínico fue desarrollado por la Universidad y sería supervisado por [e]sta con regularidad para asegurar su integridad, rigor y actualización.

19. El Estándar 4.1 de ACEN requiere a las universidades que el currículo de Maestría en Ciencias de Enfermería como Especialista Clínico sea consistente con los estándares establecidos para los programas de maestría y post-maestría, incluidas las competencias de práctica de enfermería avanzada apropiadas, los estándares y pautas profesionales específicos del rol y los requisitos de certificación, y tenga claramente articulado el aprendizaje de los estudiantes al final del programa.

20. El Estándar 6.1 de ACEN requiere que el programa de Maestría en Ciencias de Enfermería como Especialista Clínico debe demostrar evidencia del logro de los estudiantes graduados en el examen de licenciatura y/o examen de certificación.

21. El Estándar 6.2 de ACEN requiere que las universidades mantengan una evaluación continua de la medida en que los graduados de Maestría en Ciencias de Enfermería como Especialista Clínico tienen éxito en el examen de licenciatura y/o examen(es) de certificación.
22. La Junta Examinadora de Enfermería de Puerto Rico promulgó el Reglamento de la Ley Núm. 254 de 31 de diciembre de 2015, conocida como la "Ley para Regular la Práctica de la Enfermería en Puerto Rico["] (el Reglamento).
23. El inciso número 21 del Capítulo II del Reglamento define a un enfermero de práctica avanzada como aquél que posee una "licencia emitida por la Junta en categoría de enfermero(a) generalista y que ha obtenido un grado de doctorado en práctica de enfermería clínica o maestría en enfermería con enfoque en práctica avanzada", y obliga a cumplir con otros requisitos para clasificarlo como enfermero de práctica avanzada.
24. Conforme al inciso número 21 del Capítulo II del Reglamento, la categoría de enfermero de práctica avanzada incluye al especialista clínico, entre otras especialidades de práctica.
25. Conforme al inciso número 21 del Capítulo II del Reglamento, la preparación académica para un enfermero de práctica avanzada incluirá los cursos medulares de fisiopatología, examen físico y farmacología avanzados, aprobados en una institución de educación superior reconocida por la Junta de Instituciones Postsecundarias de Puerto Rico y por la Junta Examinadora de Enfermería de Puerto Rico.
26. El inciso número 21 del Cap[í]tulo II del Reglamento requiere al enfermero de práctica avanzada aprobar una reválida emitida por la Junta Examinadora de Enfermería de Puerto Rico o[,] en su lugar, haber obtenido una Certificación de la American Nurse Credentialing Center (ANCC), National Board of Certification and Recertification for Nurse Anesthetist (NBCRNA), Accreditation Commission of Midwifery and Education (ACME) u otra asociación o agencia especializada en el área correspondiente, reconocida por la Junta Examinadora de Enfermería de Puerto Rico, a los fines de obtener una licencia o certificación como enfermero de práctica avanzada.
27. Los [recurridos] aprobaron los cursos medulares de fisiopatología, examen físico y farmacología avanzados, ofrecidos por el SUAGM.
28. La Dra. Lourdes Maldonado ya no ocupa la posición de Decana del Departamento de Ciencias de la Salud de la Universidad.
29. El Dr. Juan Otero ya no ocupa la posición de Vicerrector de Asuntos Académicos de la Universidad.
30. La Junta Examinadora de Enfermería de Puerto Rico no ha creado el examen o reválida de Certificación de Práctica Avanzada.
31. El Especialista Clínico está comprendido dentro de la Práctica Avanzada.
32. La certificación "*Critical Nurse Specialist*" (CNS) que se ofrece en los Estados Unidos tuvo cambios luego del *Consensus Model*. Dicha organización eliminó el examen para los enfermeros de práctica avanzada con especialidad en Cuidado Crítico y lo convirtió en una certificación nueva CNS con especialidad en Adulto-Gero, llamado (ACCNS-AG-Adult Gerontology CNS).[10]

A su vez, el foro primario esbozó los siguientes asuntos litigiosos en controversia:

1. ¿Cumplió el SUAGM con el [E]st[á]ndar 4.1 de la ACEN[,] manteniéndose actualizada con los [e]st[á]ndares establecidos para la Maestría de Ciencias en Enfermería como Especialista Clínico en el Cuidado Crítico del Adulto?

---

[10] Véase, Apéndice B del recurso, págs. 5-10.

2. ¿El SUAGM hizo algún tipo de representación a los [recurridos] a los efectos de que podían obtener una certificación en los Estados Unidos luego de culminada la Maestría de Ciencias en Enfermería, como Especialista Clínico en el Cuidado Crítico del Adulto? De ser así, ¿[e]l SUAGM representó a los [recurridos] que podrían certificarse con las agencias acreditadoras en los Estados Unidos si tomaban el curso de Diagnóstico Diferencial?

3. ¿El co[recurrido], Pedro Hernández, comenzó a estudiar en el programa graduado de Maestría de Ciencias en Enfermería, como Especialista Clínico en el Cuidado Crítico del Adulto, ofrecido por la Universidad, en su recinto localizado en Bayamón, Puerto Rico, en agosto de 2015?

4. ¿Las co[recurridas], Sergia de los Santos y Mayra Rivera, comenzaron a estudiar en el programa graduado de Maestría de Ciencias en Enfermería, como Especialista Clínico en el Cuidado Crítico del Adulto, ofrecido por la Universidad, en su Recinto localizado en Bayamón, Puerto Rico, en agosto de 2016?

5. ¿Es cierto que[,] en junio de 2018, la Universidad informó a los [recurridos] que debían matricularse en un curso adicional, llamado Diagnóstico Diferencial, como requisito para obtener el grado de maestría mencionado y poder tomar la certificación y/o reválida de la Junta Nacional de los Estados Unidos, ofrecido por la *American Association of Critical Care Nurse* (AACN)?

6. ¿Es cierto que, a pesar de que los cambios en el currículo de la maestría ocurrieron en el año 2015, no fue hasta "agosto [de] 2018, que es el año académico 2019" -de tres a cuatro años luego- que la Universidad comenzó a ofrecer el curso de Diagnóstico Diferencial a los [recurridos]?

7. ¿Es cierto que, a pesar de que los [recurridos] tomaron y aprobaron el curso de Diagnóstico Diferencial, y a pesar de haber obtenido el grado de Maestría de Ciencias en Enfermería, como Especialista Clínico en el Cuidado Crítico del Adulto, no pudieron certificarse para el mismo?

8. ¿El SUAGM incumplió con los Estándares 6.1 y 6.2 de la ACEN?[11]

El foro *a quo* concluyó que no procedía resolver la acción de epígrafe sumariamente. En particular, expresó que el expediente ante sí demostraba que existían hechos materiales del caso que estaban realmente y de buena fe controvertidos y que debían ser adjudicados en un juicio plenario. En virtud de ello, declaró No Ha Lugar las solicitudes de sentencia sumaria promovidas por las partes.

En desacuerdo, el 9 de octubre de 2023, los recurridos presentaron una *Solicitud de Reconsideración*,[12] a la cual se opuso la parte peticionaria.[13] Posteriormente, el 13 de octubre de 2023, la Universidad

---

[11] Véase, Apéndice B del recurso, págs. 10-11.
[12] Apéndice V del recurso, págs. 639-561.
[13] Apéndice Y del recurso, págs. 707-720.

AGM sometió una *Moción en Solicitud de Reconsideración*,[14] a la cual se opuso la parte recurrida.[15]

Atendidas las referidas mociones, el 23 de febrero de 2024, notificada el 26 del mismo mes y año, el foro recurrido emitió una *Resolución*,[16] mediante la cual reconsideró únicamente el hecho incontrovertido número 32 para que lea como sigue:

> 32. Una de las certificaciones "*Critical Nurse Specialist*" (CNS) que se ofrece en los Estados Unidos tuvo cambios luego del *Consensus Model*. Dicha organización eliminó el examen para los enfermeros de práctica avanzada con especialidad en Cuidado Crítico y lo convirtió en una certificación nueva CNS con especialidad en Adulto-Gero, llamado (ACCNS-AG-Adult Gerontology CNS).[17]

Inconforme con dicha determinación, el 27 de marzo de 2024, la parte peticionaria acudió ante nos mediante el recurso de epígrafe y realizó los siguientes señalamientos de error:

> Erró el Tribunal de Primera Instancia al declarar No Ha Lugar la Moci[ó]n de Sentencia Sumaria presentada por la parte demandada.

> Err[ó] el Tribunal de Primera Instancia al declarar No Ha Lugar la Moci[ó]n de Reconsideración de la parte demandada y establecer 32 hechos incontrovertidos.

En cumplimiento con nuestra *Resolución* del 3 de abril de 2024, la parte recurrida compareció mediante *Memorando en Oposición a Expedición de Auto de Certiorari* el 15 de abril de 2024.

Con el beneficio de la comparecencia de las partes, procedemos a resolver.

## II

## A

El *certiorari* es un recurso extraordinario mediante el cual un tribunal de jerarquía superior puede revisar discrecionalmente una decisión de un tribunal inferior. *Rivera et al. v. Arcos Dorados et al.*, 2023 TSPR 65, 212 DPR ___ (2023); *Torres González v. Zaragoza Meléndez*, 211 DPR 821 (2023); *Caribbean Orthopedics v. Medshape et al.*, 207 DPR 994, 1004

---

[14] Apéndice W del recurso, págs. 652-700.
[15] Apéndice X del recurso, págs. 701-706.
[16] Apéndice A del recurso, pág. 1.
[17] Véase, Apéndice A del recurso, pág. 1.

(2021). Ahora bien, tal discreción no opera en lo abstracto. Con respecto a lo anterior y para revisar los dictámenes interlocutorios del Tribunal de Primera Instancia, la Regla 52.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 52.1, dispone, en su parte pertinente, lo siguiente:

> El recurso de *certiorari* para revisar resoluciones u órdenes interlocutorias dictadas por el Tribunal de Primera Instancia, solamente será expedido por el Tribunal de Apelaciones cuando se recurra de una resolución u orden bajo las Reglas 56 y 57 de este apéndice o de la denegatoria de una moción de carácter dispositivo. No obstante, y por excepción a lo dispuesto anteriormente, el Tribunal de Apelaciones podrá revisar órdenes o resoluciones interlocutorias dictadas por el Tribunal de Primera Instancia cuando se recurra de decisiones sobre la admisibilidad de testigos de hechos o peritos esenciales, asuntos relativos a privilegios evidenciarios, anotaciones de rebeldía, en casos de relaciones de familia, en casos que revistan interés público o en cualquier otra situación en la cual esperar a la apelación constituiría un fracaso irremediable de la justicia. Al denegar la expedición de un recurso de *certiorari* en estos casos, el Tribunal de Apelaciones no tiene que fundamentar su decisión.

> [. . .]

Según se desprende de la citada Regla, este foro apelativo intermedio podrá revisar órdenes interlocutorias discrecionalmente, cuando se recurre de decisiones sobre la admisibilidad de testigos de hechos o peritos esenciales, asuntos relativos a privilegios evidenciarios, anotaciones de rebeldía o en casos de relaciones de familia o que revistan interés público, o en aquellas circunstancias en las que revisar el dictamen evitaría un irremediable fracaso de la justicia, entre otras contadas excepciones.

A esos efectos, la Regla 40 del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 40, dispone los criterios a considerar para ejercer sabia y prudentemente su decisión de atender o no las controversias ante sí. *Torres Martínez v. Torres Ghigliotty*, 175 DPR 83, 96-97 (2008). Véase, además, *Banco Popular de Puerto Rico v. Gómez Alayón y otros*, 2023 TSPR 145, resuelto el 19 de diciembre de 2023; *Rivera et al. v. Arcos Dorados et al.*, supra; *Pueblo v. Rivera Montalvo*, 205 DPR 352, 372 (2020). Así, la Regla 40 del Reglamento del Tribunal de Apelaciones, *supra*, funge como complemento a la Regla 52.1 de Procedimiento Civil,

*supra*. *Torres González v. Zaragoza Meléndez*, supra. La precitada Regla dispone lo siguiente:

> El [T]ribunal tomará en consideración los siguientes criterios al determinar la expedición de un auto de *certiorari* o de una orden de mostrar causa:
>
> (A)   Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.
>
> (B)   Si la situación de hechos planteada es la más indicada para el análisis del problema.
>
> (C)   Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.
>
> (D)   Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.
>
> (E)   Si la etapa de los procedimientos en que se presenta el caso es la más propicia para su consideración.
>
> (F)   Si la expedición del auto o de la orden de mostrar causa no causa un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.
>
> (G)   Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia. 4 LPRA Ap. XXII-B, R. 40.

Sin embargo, ninguno de los mencionados criterios es determinante, por sí solo, para este ejercicio y no constituye una lista exhaustiva. *García v. Padró*, 165 DPR 324, 335 esc. 15 (2005). Por lo que, de los factores esbozados "se deduce que el foro apelativo intermedio evaluará tanto la corrección de la decisión recurrida, así como la etapa del procedimiento en que es presentada; esto, para determinar si es la más apropiada para intervenir y no ocasionar un fraccionamiento indebido o una dilación injustificada del litigio". *Torres Martínez v. Torres Ghigliotty*, supra, pág. 97. (Énfasis omitido).

Nuestro Tribunal Supremo ha expresado también que, de ordinario, el tribunal revisor "no intervendrá con el ejercicio de la discreción de los tribunales de instancia, salvo que se demuestre que hubo un craso abuso de discreción, o que el tribunal actuó con prejuicio o parcialidad, o que se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo, y que nuestra intervención en esa etapa evitará un

perjuicio sustancial*". Zorniak Air Servs. v. Cessna Aircraft Co.*, 132 DPR 170, 181 (1992), citando a *Lluch v. España Service Sta.*, 117 DPR 729, 745 (1986). Véase, además, *Rivera y otros v. Bco. Popular*, 152 DPR 140, 155 (2000).

**B**

El mecanismo de sentencia sumaria provisto en la Regla 36 de Procedimiento Civil de 2009, 32 LPRA Ap. V, R. 36, es un vehículo para asegurar la solución justa, rápida y económica de un caso. *Serrano Picón v. Multinational Life Ins.*, 2023 TSPR 118, 212 DPR ___ (2023); *Oriental Bank v. Caballero García*, 2023 TSPR 103, 212 DPR ___ (2023); *González Meléndez v. Mun. San Juan et al.*, 2023 TSPR 95, 212 DPR ___ (2023); *Acevedo y otros v. Depto. Hacienda y otros*, 2023 TSPR 80, 212 DPR ___ (2023); *Universal Ins. y otro v. ELA y otros*, 211 DPR 455 (2023). Dicho mecanismo permite a los tribunales disponer, parcial o totalmente, de litigios civiles en aquellas situaciones en las cuales no exista controversia material de hecho que requiera ventilarse en un juicio plenario y el derecho así lo permita. *Segarra Rivera v. Int'l. Shipping et al.*, 208 DPR 964 (2022). Este mecanismo lo puede utilizar la parte reclamante o aquella parte que se defiende de una reclamación. 32 LPRA Ap. V, R. 36.1 y 36.2.

Mediante el mecanismo de sentencia sumaria, se procura profundizar en las alegaciones para verificar si, en efecto, los hechos ameritan dilucidarse en un juicio. *León Torres v. Rivera Lebrón,* 204 DPR 20, 42 (2020). Este cauce sumario resulta beneficioso tanto para el tribunal, como para las partes en un pleito, pues se agiliza el proceso judicial, mientras simultáneamente se provee a los litigantes un mecanismo procesal encaminado a alcanzar un remedio justo, rápido y económico. *Segarra Rivera v. Int'l. Shipping et al.*, supra. Como se sabe, en aras de prevalecer en una reclamación, la parte promovente debe presentar prueba incontrovertible sobre todos los elementos indispensables de su causa de acción. *Íd.*

Nuestro ordenamiento civil y su jurisprudencia interpretativa impone unos requisitos de forma con los cuales hay que cumplir al momento de presentar una solicitud de sentencia sumaria, a saber: (1) una exposición breve de las alegaciones de las partes; (2) los asuntos litigiosos o en controversia; (3) la causa de acción sobre la cual se solicita la sentencia sumaria; (4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal; (5) las razones por las cuales se debe dictar la sentencia, argumentando el derecho aplicable, y (6) el remedio que debe ser concedido. 32 LPRA Ap. V, R. 36.3; *Oriental Bank v. Caballero García*, supra, pág. 8; *Pérez Vargas v. Office Depot*, 203 DPR 687 (2019). Si la parte promovente de la moción incumple con estos requisitos, "el tribunal no estará obligado a considerar su pedido". *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 111 (2015).

Por otro lado, "la parte que desafía una solicitud de sentencia sumaria no puede descansar en las aseveraciones o negaciones consignadas en su alegación". *León Torres v. Rivera Lebrón,* supra*,* pág. 43. Por el contrario, quien se opone a que se declare con lugar esta solicitud viene obligado a enfrentar la moción de su adversario de forma tan detallada y específica como lo ha hecho la parte promovente puesto que, si incumple, corre el riesgo de que se dicte sentencia sumaria en su contra, si la misma procede en derecho. *Íd.*

Por ello, en la oposición a una solicitud de sentencia sumaria, la parte promovida debe puntualizar aquellos hechos propuestos que pretende controvertir y, si así lo desea, someter hechos materiales adicionales que alega no están en disputa y que impiden que se dicte sentencia sumaria en su contra. *León Torres v. Rivera Lebrón,* supra. Claro está, para cada uno de estos supuestos deberá hacer referencia a la

prueba específica que sostiene su posición, según exigido por la Regla 36.3 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3. *Íd.* En otras palabras, la parte opositora tiene el peso de presentar evidencia sustancial que apoye los hechos materiales que alega están en disputa. *Íd.* De lo anterior, se puede colegir que, ante el incumplimiento de las partes con las formalidades de la Regla 36 de Procedimiento Civil de 2009, *supra*, la consideración de sus posiciones descansa en la sana discreción del Tribunal.

Al atender la solicitud, el Tribunal deberá asumir como ciertos los hechos no controvertidos que se encuentren sustentados por los documentos presentados por la parte promovente. *E.L.A. v. Cole*, 164 DPR 608, 626 (2005). Toda inferencia razonable que pueda surgir de los hechos y de los documentos se debe interpretar en contra de quien solicita la sentencia sumaria, pues solo procede si bajo ningún supuesto de hechos prevalece la parte promovida. *Íd.*, pág. 625. Además, al evaluar los méritos de una solicitud de sentencia sumaria, el juzgador o juzgadora debe actuar guiado por la prudencia y ser consciente, en todo momento, que su determinación puede conllevar el que se prive a una de las partes de su "día en corte", componente integral del debido proceso de ley. *León Torres v. Rivera Lebrón,* supra*,* pág. 44.

Sin embargo, la sentencia sumaria generalmente no procederá cuando existan controversias sobre hechos esenciales materiales, o si la controversia del caso está basada en elementos subjetivos como intención, propósitos mentales, negligencia o credibilidad. *Acevedo y otros v. Depto. Hacienda y otros*, supra; *Segarra Rivera v. Int'l. Shipping et al.*, supra. Un hecho material es aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable. *Oriental Bank v. Caballero García,* supra, pág. 7; *Mejías et al. v. Carrasquillo et al.*, 185 DPR 288, 299 (2012); *Ramos Pérez v. Univisión*, 178 DPR 200, 213 (2010). Ahora bien, el Foro de última instancia ha reiterado que cualquier duda no es suficiente para derrotar una moción de sentencia sumaria, pues debe tratarse de una

incertidumbre que permita concluir que existe una controversia real sobre hechos relevantes y pertinentes. *Íd.* Además, existen casos que no se deben resolver mediante sentencia sumaria porque resulta difícil reunir la verdad de los hechos mediante declaraciones juradas o deposiciones. *Jusino et als. v. Walgreens*, 155 DPR 560, 579 (2001). De igual modo, no es apropiado resolver por la vía sumaria "casos complejos o casos que involucren cuestiones de interés público". *Íd.* No obstante, la sentencia sumaria procederá si atiende cuestiones de derecho. *Universal Ins. y otro v. ELA y otros*, supra.

El Tribunal Supremo de Puerto Rico ha discutido los criterios que este Tribunal de Apelaciones debe considerar al momento de revisar una sentencia dictada sumariamente por el foro de instancia. *Roldán Flores v. M. Cuebas et al.*, 199 DPR 664, 679-680 (2018); *Meléndez González et al. v. M. Cuebas*, supra, págs. 118-119. Sobre ese particular, nuestro más Alto Foro señaló que:

> [E]l Tribunal de Apelaciones debe: (1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra*, y la jurisprudencia le exigen al foro primario; (2) revisar que tanto la Moción de Sentencia Sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36; (3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos, y (4) de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia. *Roldán Flores v. M. Cuebas et al.,* supra, pág. 679.

Conforme a lo anterior, nos encontramos en la misma posición que el Tribunal de Primera Instancia para evaluar la procedencia de una sentencia sumaria. *Birriel Colón v. Econo y otros*, 2023 TSPR 120, 213 DPR ___ (2023); *Serrano Picón v. Multinational Life Ins.*, supra; *González Meléndez v. Mun. San Juan et al.*, supra; *González Santiago v. Baxter Healthcare*, 202 DPR 281, 291 (2019). Por ello, nuestra revisión es una *de novo* y nuestro análisis debe regirse por las disposiciones de la Regla 36 de Procedimiento Civil, *supra*, así como de su jurisprudencia interpretativa.

*González Meléndez v. Mun. San Juan et al.*, supra. A tenor con la referida normativa, dicha revisión se realizará de la manera más favorable hacia la parte que se opuso a la solicitud de sentencia sumaria en el foro de origen y realizando todas las inferencias permisibles a su favor. *Birriel Colón v. Econo y otros*, supra; *Meléndez González et al. v. M. Cuebas*, supra, pág. 118. De esta manera, si entendemos que los hechos materiales realmente están incontrovertidos, debemos revisar *de novo* si el foro primario aplicó correctamente el derecho. *González Meléndez v. Mun. San Juan et al.*, supra.

Esbozada la norma jurídica, procedemos a aplicarla al recurso ante nos.

**III**

En síntesis, la parte peticionaria plantea que el Tribunal de Primera Instancia erró al declarar No Ha Lugar la solicitud de sentencia sumaria promovida por esta. Por otro lado, sostiene que el foro primario incidió, además, al declarar No Ha Lugar su moción de reconsideración y establecer 32 hechos incontrovertidos.

Hemos evaluado el recurso de epígrafe conforme exige la normativa antes expuesta con particular atención a los criterios que le corresponde utilizar al Tribunal de Apelaciones al momento de revisar determinaciones del foro de instancia, según *Meléndez González et al. v. M. Cuebas,* supra. Luego de un examen sosegado del expediente ante nos, colegimos que no existe criterio jurídico que amerite nuestra intervención con lo resuelto por el Tribunal de Primera Instancia. Al entender sobre los planteamientos que la parte peticionaria propone ante este Foro, concluimos que la sala de origen no incurrió en error de derecho ni en abuso de discreción al declarar No Ha Lugar la solicitud de sentencia sumaria promovida por la parte peticionaria, ello a fin de que podamos soslayar la norma de abstención judicial que, en dictámenes como el de autos, regula el ejercicio de nuestras funciones.

Al evaluar *de novo* los documentos que nos ocupan, coincidimos con que, al adjudicar el asunto, el Tribunal de Primera Instancia actuó de conformidad con las normas que prevalecen en la materia que atendemos. Ello, nos hace concluir que nuestra intervención, en esta etapa de los procedimientos, no resulta oportuna. Siendo así, y en ausencia de prueba que nos permita resolver en contrario, denegamos expedir el auto de *certiorari* que nos ocupa, al amparo de lo dispuesto en la Regla 52.1 de Procedimiento Civil, *supra*, y la Regla 40 de nuestro Reglamento, *supra*.

**IV**

Por los fundamentos que anteceden, denegamos la expedición del recurso de *certiorari* solicitado.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones